**2017 UT App 226**

## THE UTAH COURT OF APPEALS

KYLE R. HALL,
Appellee,

*v.*

DAVID L. PETERSON,
Appellant.

Opinion
No. 20150459-CA
Filed December 7, 2017

Sixth District Court, Manti Department
The Honorable Marvin D. Bagley
No. 120600065

Kasey L. Wright and Cherylyn Egner, Attorneys
for Appellant

Troy L. Booher, Clemens A. Landau, and Russell A.
Cline, Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES GREGORY K. ORME and JILL M. POHLMAN concurred.

MORTENSEN, Judge:

¶1     Since 1965, David L. Peterson, individually and through his trust, has owned a large tract of recreational mountain property east of Mount Pleasant in Sanpete County.[1] Part of the property is known as Buckhorn Flats. Between 2010 and 2013, Kyle R. Hall purchased four lots near Buckhorn Flats. A dirt

---

1. Peterson passed away in June 2014. However, he is still listed as the appellant in this matter as the trustee of the David L. Peterson Trust. Appellant refers to the current trustees of the Peterson estate as "Appellant" or "Peterson." We follow this pattern for consistency.

road (the Peterson Road) crosses Buckhorn Flats and is the only access to another road (the Spur Road) that leads to Hall's four lots. When Peterson would not allow access across Buckhorn Flats using the Peterson Road, Hall sued. At trial, the jury found that the evidence established an easement by estoppel, allowing Hall to use the Peterson Road. On appeal, Peterson argues that the evidence at trial was insufficient to support an easement by estoppel and that his motion for a directed verdict should have been granted.[2] Peterson also argues that the trial court erred in not defining the scope of the easement and in its determination of the prevailing party and award of costs. We reverse the trial court's denial of Peterson's motion for a directed verdict.

BACKGROUND[3]

¶2    Peterson owned Buckhorn Flats beginning sometime prior to 1965. Peterson conveyed that property to the David L.

---

2. Although the jury accepted only the easement by estoppel theory, Hall also brought claims for prescriptive easement, easement by necessity, public road, recorded easement, and wrongful denial of access. Only prescriptive easement, easement by estoppel, and public road were submitted to the jury by way of a special verdict form. The jury found against Hall on the claims for prescriptive easement and public road.

3. "When reviewing any challenge to a trial court's denial of a motion for directed verdict, we review the evidence and all reasonable inferences that may fairly be drawn therefrom in the light most favorable to the party moved against[.]" *Mahmood v. Ross*, 1999 UT 104, ¶ 16, 990 P.2d 933 (citation and internal quotation marks omitted). The facts stated herein have been construed in a light most favorable to Hall—the party moved against. However, where evidence was lacking, we have noted that absence in our factual recitation.

Peterson Trust in 2006. Adjacent to Buckhorn Flats is land that has been variously owned by other entities. Hall now owns four lots of that adjacent property. The Peterson Road, going across Buckhorn Flats, is the only way to access those lots by vehicle.

¶3    Sometime around 1996 Peterson built a gate that blocked access to the Peterson Road. Hall's family obtained a key to the gate,[4] but Peterson changed the locks around 2008. Hall first personally asked Peterson for a key to the gate in 2010, after he purchased property beyond Buckhorn Flats. Peterson refused, despite Hall showing Peterson proof of ownership of property beyond the gate. Hall then purchased other parcels even though Peterson had denied him a key. Hall eventually brought this action seeking access along the Peterson Road.

¶4    One theory Hall advanced at trial, and upon which he ultimately prevailed, was that through the predecessors in interest to his properties Hall could establish an easement by estoppel across Buckhorn Flats to access those properties. Therefore, the manner in which Hall's predecessors in interest used the Peterson Road over the many years was at issue during trial.

*Hall's Predecessors in Interest*

¶5    Hall purchased his four lots between 2010 and 2013—one from Lula Jean Thomas in 2010, two from David Gobel in 2011, and one from Alice Smith in 2013. Alice Smith had acquired her property from her son, Ronald Smith (Smith).[5] Both Thomas and

---

4. Hall did not personally own property at the time, but his family has owned property nearby for some time.

5. The record does not establish when Smith sold the property to his mother. In any case, Alice Smith did not testify at trial, and her use of the Peterson Road, if any, is not in evidence.

Smith acquired their properties from Diversified Marketing (Diversified) in the 1970s. At trial, Gobel did not testify and there was no evidence presented showing the historical ownership of the Gobel lots.

*Predecessors' Use of the Peterson Road*

¶6     Although Thomas and Smith only visited their respective properties a few times over a period of many years, on the rare occasion that they would travel to their properties, they drove to their lots by use of a dirt road.[6] Smith drove with an unidentified Diversified representative "to what they said was [his] piece of property" shortly after Smith agreed to buy the property. Smith subsequently drove to his property two more times, but he had not been to the property in roughly thirty years. Thomas visited her lots "three, maybe four" times from the time she acquired them in the "late '60s, early '70s" until she sold one of her lots to Hall. Thomas never asked for or received permission to use the Peterson Road.

¶7     Diversified, the previous owner of the Smith and Thomas lots, purchased those lots sometime prior to 1974 as part of roughly 1,550 acres of property to the south of Buckhorn Flats.[7]

---

6. Although the witnesses did not testify that they specifically used the Peterson Road to access their properties (most, it seems, were unaware that they were crossing another's property and assumed they were on a public road), the evidence established that the only road that provides driving access to the witnesses' respective properties is the Peterson Road.

7. The date Diversified acquired the property south of Buckhorn Flats is not mentioned in the briefs. The testimony at trial from the previous land owner, Neil Jorgensen, was that he at one time (but not at the same time) owned both Buckhorn Flats and the

(continued…)

Diversified began selling "little parcels" of that property. A "spur road" was built off of the Peterson Road and provided access to some of the lots Diversified sold, including Hall's lots. Hall provided the only testimony at trial about who built the Spur Road, testifying that Diversified built it. Hall also testified, however, that he neither saw Diversified build the Spur Road nor had any supporting documentation as a basis for his testimony.

¶8 Three witnesses testified about the possible use or presence of construction machinery on Diversified's property, which presumably could only have been brought there through use of the Peterson Road. An excavating contractor, testifying as an expert witness, opined that the Spur Road "was maybe 15 feet across or so, and . . . [that it] would take a machine to build the road that wide, that significant." A second expert, a general contractor, agreed. These witnesses did not testify about how many machines would have been necessary or how long it would have taken to grade the road. The third witness, Smith, testified that after he purchased the property in the 1970s, but before 1980, on one occasion he "saw a bulldozer south of [his] property" where Diversified "said there would be a clubhouse" and that Diversified had "bulldozed a short section of an area south of [his] property[] . . . in an area which [Diversified] said was what they were selling." When asked about the bulldozer's exact location, Smith stated, "I can't tell you how far south, but it was south of the property." Smith did not testify that the bulldozer was on the Peterson Road or that it was being used for making a road or any other improvement.

---

(…continued)
property to the south. Jorgensen testified that he owned and sold Buckhorn Flats before he owned the property to the south.

*Other Use of the Peterson Road*

¶9    The jury heard testimony from other witnesses—Johansen, Vincent, Seely, Sorensen, R. Hall, C. Hall, and Matthews—that the Peterson Road had been used on isolated instances over a period of decades without obstruction or restriction.

¶10    Johansen, a person familiar with the area, gave deposition testimony that he drove on the Peterson Road in the 1970s for hunting but at trial testified that he did not ever remember using a vehicle while on the Peterson Road. Johansen acknowledged that when he was deposed he had stated that he saw people from out of state use vehicles on the Peterson Road, but at trial he testified he did not "know of" any other vehicles using the road back in the 1970s. An affidavit signed by Johansen was read at trial stating that the "south roads have been used as [a] public thoroughfare," but Johansen did not remember asserting that when questioned at trial. Johansen did not testify that Peterson was present on any of these occasions.

¶11    Vincent, a property owner in the area, testified that she had asked Peterson for permission to use the Peterson Road, and that from 1991 to 1996 she had "free access" to her property by use of the road. She also testified that she saw people using ATVs on the road during this time. Vincent in no way quantified whether this was a single occurrence or whether she observed ATVs frequently. Vincent did not testify that Peterson was present on any of these occasions. Vincent did not testify one way or the other whether the ATV riders had sought permission to ride on the road. Peterson eventually limited her access to the Peterson Road and she has not had access to her property since 2009.

¶12    Seely, an owner of nearby property and a person "[v]ery familiar" with the area, testified that, in the 1950s through 1962, "a lot of people" used vehicles on the Peterson Road to "hunt

deer up there on Buckhorn Flat" and that "[t]he competition was pretty great up there . . . [during] the deer hunt." While Seely testified of many other times hunting "potguts" and "plant[ing] potatoes for [Peterson]" on other sections of Peterson's property, none of those other instances included use of the Peterson Road on Buckhorn Flats. Seely reiterated that he was not in the area in the 1970s and 1980s.

¶13    Sorensen, another property owner in the area, testified about his use of the Peterson Road. The first time Sorensen visited his property, he and a real estate agent "drove as far as [they] could, and then [they] hiked in." After he purchased his property in 1976, he "just drove right to" the property on "the only [road] that [he was] aware of" "at least once a summer" for "[t]en, twelve years or so." Sorensen never asked permission to use the Peterson Road and no one ever objected to him using it. Sorensen did not testify that Peterson was present on any of these occasions. Sorensen has been unable to access his property since the "early to mid- '90s" because of a "chain" or a "gate" blocking the Peterson Road.

¶14    R. Hall, Hall's father and an owner of nearby property accessible from an alternate road, testified that, from around 1977 until around 2006, he would "go up there at least once a year, sometimes more" and drive trucks and ATVs on the Peterson Road for recreational purposes. R. Hall testified that the Peterson Road was "just an open road. People up there driving around, hunting, doing activities. People from town coming up on four-wheelers. It was just . . . open. There was no gate[], no trespassing signs. It was always open." C. Hall, Hall's mother and a person familiar with nearby property, testified about her personal use of the road and seeing others use the Peterson Road in a similar manner described by R. Hall.

¶15    The deposition of Matthews, another property owner in the area, was read into evidence during trial. Matthews had

driven to his property once "back in . . . 1974." Matthews's deposition reads:

> Q.     Who did you go with? Who did you drive up there with?
>
> A.     As I remember there was a group of us that were owners . . . . And I remember going with, you know, five or six other owners, Sherm Clowder and Arden Kitchen for sure.
>
> Q.     Did a real estate—
>
> A.     And probably Paul Richards.
>
> Q.     I apologize.
>
> A.     Yeah, and probably Paul Richards too.[8]

Matthews tried to go back to the property "a couple of times," but was unable to reach it because "[t]here [were] fences there, and it was a little more snowy and muddy, and [they] couldn't get up there because of those two problems."

### *Motion for Directed Verdict*

¶16     After Hall had presented his evidence, Peterson moved for a directed verdict, arguing that there was insufficient evidence to support Hall's claim for easement by estoppel. The following argument about easement by estoppel was made on the motion:

---

8. Hall later argued that a reasonable juror could infer from this testimony that real estate agents frequently used the Peterson Road. Paul Richards is another property owner.

[Attorney for Hall]: Mr. Peterson[] permitted another to use his land under the circumstances in which it was reasonable to foresee that the user would substantially change position believing that the permission would not be revoked.

[The Court]: So is it enough that [an owner] went there and looked at it and then bought it? Is that enough?

[Attorney for Hall]: Yes. . . .

[The Court]: Just because he drove to it and looked at the property.

[Attorney for Hall]: Well, Diversified—the Petersons knew that Diversified was crossing . . . .

¶17 The trial court denied Peterson's motion after reviewing the evidence relevant to the elements of easement by estoppel. Specifically, the court examined whether Peterson gave permission to Hall or his predecessors in interest to use the Peterson Road, whether it was foreseeable to Peterson that others would rely on that permission, and whether Hall or his predecessors in interest substantially changed position based on a belief that permission would not be revoked. The trial court ultimately concluded that there was sufficient evidence for the jury to determine that there was an easement by estoppel.

*Verdict*

¶18 After the conclusion of the presentation of evidence, the jury answered the special verdict form and found that the elements of easement by estoppel were met. The trial court entered judgment granting Hall an easement by estoppel based on the jury's answers. The trial court also awarded costs to Hall, determining that Hall was the prevailing party. Peterson filed a

motion for judgment notwithstanding the verdict, which the trial court denied. Peterson appeals the denial of his motion for directed verdict.

ISSUE AND STANDARD OF REVIEW

¶19    We review whether there was sufficient evidence for the trial court to deny Peterson's motion for a directed verdict.

> When reviewing any challenge to a trial court's denial of a motion for directed verdict, we review the evidence and all reasonable inferences that may fairly be drawn therefrom in the light most favorable to the party moved against, and will sustain the denial if reasonable minds could disagree with the ground asserted for directing a verdict. As this Court's standard of review of a directed verdict is the same as that imposed upon the trial court, we review the trial court's decision to determine if the evidence at trial raised a question of material fact which precluded judgment as a matter of law.

*Mahmood v. Ross*, 1999 UT 104, ¶ 16, 990 P.2d 933 (brackets, citations, and internal quotation marks omitted); *see also Merino v. Albertsons, Inc.*, 1999 UT 14, ¶¶ 3, 8, 975 P.2d 467 (reversing the denial of a directed verdict motion); *Salt Lake City v. Gallegos*, 2015 UT App 78, ¶ 5, 347 P.3d 842 (same).

ANALYSIS

I. Preservation

¶20    As a preliminary matter, we address Hall's argument that most of Peterson's arguments on appeal are unpreserved. An issue is preserved when the issue is "presented to the trial court

in such a way that the trial court has an opportunity to rule on that issue." *438 Main St. v. Easy Heat, Inc.*, 2004 UT 72, ¶ 51, 99 P.3d 801 (citation and internal quotation marks omitted). This court generally will not review issues that are not preserved in the trial court unless there is a showing of plain error or exceptional circumstances. *See York v. Shulsen*, 875 P.2d 590, 594 (Utah Ct. App. 1994).

¶21  Peterson does not argue plain error or exceptional circumstances. We therefore must only determine if the issue—whether there was sufficient evidence to support a verdict establishing an easement by estoppel—was presented at trial in a way that the trial court could rule on all of the elements of easement by estoppel.

¶22  The trial court instructed the jury as follows on the elements of easement by estoppel:

> An easement by estoppel can only be granted if it is established by a preponderance of the evidence that: (1) the owner or occupier permitted another to use that land under circumstances in which it was reasonable to foresee that the user would substantially change position believing that the permission would not be revoked; (2) the user did substantially change position in reasonable reliance on that belief; and (3) granting the user an easement is necessary to avoid injustice.[9]

---

9. Peterson did not object to this instruction nor does he claim on appeal that the instruction misstates the law. Our attention has been directed to no Utah appellate court decision recognizing easement by estoppel. The trial moved forward under this theory and Peterson does not challenge its existence in Utah. Accordingly, like the parties, we assume its existence. Easement

(continued…)

¶23 Hall argues that the issues presented on appeal are only partially preserved because Peterson "moved for directed verdict with respect to only . . . reasonable reliance." Thus, Hall argues, Peterson is barred from challenging the sufficiency of the evidence on any other element of easement by estoppel—"permission by the owner, . . . reasonable foreseeability by the owner, . . . and substantial change by [the] user."

¶24 The record does not support Hall's position. The parties argued permission by the landowner, the landowner's foreseeability of reasonable reliance, and substantial change of position during the motion. *See supra* ¶¶ 16–17. Peterson never conceded that any of the elements were supported by the evidence, and the trial court made specific conclusions going to the elements Hall claims are unpreserved.

¶25 As to Peterson's knowledge and implied permission to use the road, the court determined that "it's reasonable to believe that [Peterson] would have known that the . . . spur road was being built." The court also made conclusions in its ruling addressing reasonable foreseeability by the landowner, saying, "It would be reasonable for him to foresee or to believe that others intended to use [the Peterson Road] to access that spur road that was being built." Likewise, substantial change by the user was also discussed extensively during argument on the motion. Hall argued, "Peterson knew or he should have known that Diversified and buyers and prospective buyers were coming across his property and changing their position by building new roads, changing their position by selling property, [and] changing their position by buying property based on an

---

(…continued)
by estoppel has been recognized in a federal court action in Utah. *Intermountain Resources, LLC v. Jorgensen*, No. 2:08–CV–80 TS, 2010 WL 4237313, at *4 (D. Utah Oct. 21, 2010).

assumption." Thus, the record demonstrates that all of the elements of easement by estoppel that Peterson challenges on appeal[10] were "presented to the trial court in such a way that the trial court ha[d] an opportunity to rule on that issue." *See 438 Main St. v. Easy Heat, Inc.*, 2004 UT 72, ¶ 51, 99 P.3d 801 (citation and internal quotation marks omitted). Therefore, we address all of Peterson's arguments.

## II. Sufficiency of the Evidence

¶26　We next review whether the evidence at trial was sufficient to support an easement by estoppel.

> Under Utah law, a party who moves for a directed verdict has the very difficult burden of showing that *no* evidence exists that raises a question of material fact. If there is any evidence raising a question of material fact, judgment as a matter of law is improper. Thus, a motion for a directed verdict is only appropriate when the court is able to conclude, as a matter of law, that reasonable minds would not differ on the facts to be determined from the evidence presented.

*Mahmood v. Ross*, 1999 UT 104, ¶ 18, 990 P.2d 933 (citations and internal quotation marks omitted). "[T]he court is not free to weigh the evidence and thus invade the province of the jury, whose prerogative it is to judge the facts." *Id.*

¶27　However, even where evidence exists, that evidence must be material and sufficiently probative to enable a factfinder to do more than speculate before a directed verdict motion should be

---

10. The third element in the jury instruction, "granting the user an easement is necessary to avoid injustice," is not challenged on appeal.

denied. *Salt Lake City v. Gallegos*, 2015 UT App 78, ¶ 11, 347 P.3d 842 (reversing the denial of a directed verdict motion where the jury's verdict required speculation). For example, in *Mahmood*, after the denial of a motion for a directed verdict, a jury had returned a verdict in favor of a plaintiff on the issues of causation and mitigation of damages. In reversing, our supreme court explained:

> Proximate cause is generally determined by an examination of the facts, and questions of fact are to be decided by the jury. Thus, courts should refuse to grant a directed verdict on issues of causation if there is any evidence which might lead a reasonable jury to find a causal connection between a breach and a subsequent injury. However, this does not mean that a jury is free to find a causal connection between a breach and some subsequent injury by relying on unsupported speculation. Although juries may make deductions based on reasonable probabilities, the evidence must do more than merely raise a conjecture or show a probability. Where there are probabilities the other way equally or more potent the deductions are mere guesses and the jury should not be permitted to speculate. The rule is well established in this jurisdiction that where the proximate cause of the injury is left to conjecture, the plaintiff must fail as a matter of law.

*Mahmood*, 1999 UT 104, ¶ 22 (citations and internal quotation marks omitted). After reviewing the evidence, the court in *Mahmood* concluded there was insufficient evidence of causation and held that the issue of causation should not have been submitted to the jury. *Id.* ¶ 29. The *Mahmood* court then similarly reviewed the evidence and found it insufficient to submit the

issue of mitigation of damages to the jury and held that the directed verdict should have been granted. *Id.* ¶¶ 37, 39.

¶28 With this standard in mind, we proceed to review the law of easement by estoppel and the sufficiency of the evidence in support of that claim in this case. As noted above, *supra* ¶ 22 note 9, no Utah state court decision has recognized easement by estoppel, but we assume its existence for purpose of this appeal. Notwithstanding the lack of recognition for easement by estoppel, estoppel itself is a well-recognized legal principle.

¶29 The estoppel asserted here is an equitable estoppel because it arose from the parties' conduct, not from a record or contract. *See Youngblood v. Auto-Owners Ins. Co.*, 2005 UT App 154, ¶ 12, 111 P.3d 829 ("Utah courts define equitable estoppel as conduct by one party which leads another party, in reliance thereon, to adopt a course of action resulting in detriment or damage if the first party is permitted to repudiate his conduct." (citation and internal quotation marks omitted)); 31 C.J.S. *Estoppel & Waiver* § 1 (2017) (defining equitable estoppel as "all forms of estoppel not arising from a record, from a deed, or from a written contract"). "The gravity of a judicial means of acquiring an interest in land of another solely by parol [evidence] requires that equitable estoppel be strictly applied, and the estoppel should be certain, precise and clear." *McClung v. Ayers*, 352 S.W.3d 723, 729 (Tex. App. 2011) (footnote, citations, and internal quotation marks omitted).

> To prevail on a claim of equitable estoppel, a party must establish three elements. First, there must be a statement, admission, act, or failure to act by one party inconsistent with a claim later asserted. Second, estoppel requires reasonable action or inaction by the other party taken or not taken on the basis of the first party's statement, admission, act or failure to act. Third, there must be injury to the second party that would result from allowing

the first party to contradict or repudiate such statement, admission, act, or failure to act.

*Salt Lake City Corp. v. Big Ditch Irrigation Co.*, 2011 UT 33, ¶ 41, 258 P.3d 539 (citations and internal quotation marks omitted).

¶30 The parties based the jury instruction outlining the elements of easement by estoppel on language found in the Restatement (Third) of Property, generally tracking the requirements for equitable estoppel outlined above:

> If injustice can be avoided only by establishment of a servitude, the owner or occupier of land is estopped to deny the existence of a servitude burdening the land when:
>
> (1) the owner or occupier permitted another to use that land under circumstances in which it was reasonable to foresee that the user would substantially change position believing that the permission would not be revoked, and the user did substantially change position in reasonable reliance on that belief[.]

Restatement (Third) of Prop.: Servitudes § 2.10 (Am. Law Inst. 2000). The three elements argued at trial, and thus the elements that we review here, are (1) permission granted by the landowner, (2) reasonable foreseeability by the landowner that the user would rely on the permission he or she has been granted, and (3) substantial change of position by the user based on the permission by the landowner.

¶31 The first element, permission, is a question of fact. *See Home of Economy v. Burlington N. Santa Fe R.R.*, 2010 ND 49, ¶¶ 21–22, 780 N.W.2d 429 (reviewing the representation communicated to the promisee as a factual finding). Permission need not be expressed in writing; but generally some

representation must be communicated by the landowner. *See id.* ¶ 21 ("To establish a valid claim for an easement by estoppel, the party claiming the existence of the easement must show a representation was communicated to the promisee, the representation was believed, and there was a reliance upon the communication." (citation and internal quotation marks omitted)); *S & G Associated Developers, LLC v. Covington Oaks Condo. Owners Ass'n*, 361 S.W.3d 210, 216 (Tex. App. 2012) ("The elements for an easement by estoppel are: (1) a representation communicated, either by word or action, to the promisee; (2) the communication was believed; and (3) the promisee relied on the communication."); 25 Am. Jur. 2d *Easements & Licenses* § 19 (2017) (stating the permissive element of easement by estoppel as "a representation communicated, either by word or action, to the promisee"). Permission can take the form of silence. However, "for silence to work an estoppel, there must be a legal duty to speak, or there must be something willful or culpable in the silence which allows another to place himself in an unfavorable position by reason thereof." *First Inv. Co. v. Andersen*, 621 P.2d 683, 687 (Utah 1980) (citation and internal quotation marks omitted). "The duty to speak does not arise until the silent party is himself aware of the facts." *Martin v. Cockrell*, 335 S.W.3d 229, 238 (Tex. App. 2010) (citation and internal quotation marks omitted).

¶32   The second and third elements, reasonable foreseeability by the landowner and substantial change by the user, are also questions of fact. *See, e.g.*, *B.R. ex rel. Jeffs v. West*, 2012 UT 11, ¶¶ 25–26, 275 P.3d 228 (noting that foreseeability with respect to proximate cause presents a question of fact); *Timothy v. Keetch*, 2011 UT App 104, ¶ 10, 251 P.3d 848 ("Reasonable reliance is generally a factual matter[.]"); *Kapp v. Norfolk S. Ry. Co.*, 350 F. Supp. 2d 597, 612 (M.D. Pa. 2004) (discussing substantial change of position as "a factual determination"). Both reasonable foreseeability and substantial change must be based on the first element, permission. *See* Restatement (Third) of Prop.:

Servitudes § 2.10 (Am. Law Inst. 2000) (indicating that equitable estoppel may be invoked "under circumstances in which it was reasonable to foresee that the user would substantially change position *believing that the permission would not be revoked*, and the user did substantially change position in reasonable reliance *on that belief*" (emphases added)).

¶33    The elements for an easement by estoppel, being questions of fact, are generally to be determined by a jury. Thus, courts should refuse to grant a directed verdict on easement by estoppel if there is any evidence which might lead a reasonable jury to find the elements are met. *Mahmood v. Ross*, 1999 UT 104, ¶ 22, 990 P.2d 933. However, a jury may not find such elements are met by relying on unsupported speculation. *Id.*

¶34    The trial court denied Peterson's motion for a directed verdict on the basis that the jury could make reasonable inferences based on the evidence to reach its verdict.

> [T]he distinction between reasonable inference and speculation is intensely fact-based. When evidence supports only one possible conclusion, the quality of the inference rests on the reasonable probability that the conclusion flows from the proven facts. When the evidence supports more than one possible conclusion, none more likely than the other, the choice of one possibility over another can be no more than speculation; while a reasonable inference arises when the facts can reasonably be interpreted to support a conclusion that one possibility is more probable than another.

*State v. Cristobal*, 2010 UT App 228, ¶ 16, 238 P.3d 1096 (citation and internal quotation marks omitted). While this general premise is true, it fails to support the verdict here.

¶35 We hold that evidence does not exist in the record that supports the needed inferences to establish an easement by estoppel through Hall or any of his predecessors in interest. Because Hall essentially concedes that he cannot personally establish an easement by estoppel,[11] we examine the shortcomings of the evidence as they relate to his predecessors in interest, namely, Diversified, Gobel, Smith, and Thomas.[12]

A.    Diversified

¶36 Diversified is arguably a predecessor in interest to all of Hall's properties.[13] The trial court denied Peterson's directed verdict motion based on its conclusion that the evidence showed that Peterson "would have known" that the Spur Road was being built and that the Peterson Road was being regularly and frequently used to facilitate that work. Peterson asserts that insufficient evidence exists to support such an inference. In

11. Hall cannot individually establish an easement by estoppel because he purchased all of his parcels after Peterson installed the gate and changed the locks. Therefore, Hall could not have substantially changed position on a belief that permission to use the road would not be revoked because he bought the parcels knowing he did not have Peterson's permission to use the Peterson Road.

12. The trial court concluded that "tacking" applies to easement by estoppel such that Hall is entitled to an easement if he shows that one of his predecessors in interest satisfies the requirements for the easement. Because Peterson does not appeal this determination, we have no occasion to review it.

13. Hall argues that, although Gobel did not testify and there was no evidence on the historical ownership of the Gobel properties, the evidence was enough to allow a jury to infer that Gobel also received his property from Diversified.

support of the trial court's ruling, Hall claims that the evidence demonstrates that Peterson "gave express or implied permission to [Diversified] to use his road to develop hundreds of acres of otherwise landlocked property to the south of [Peterson's] property." This conclusion is based on the premise that Peterson "allowed the developer to use [Peterson's] road to move heavy machinery to build new roads and facilities, and stood by as the developer subdivided the property to the south into numerous small lots and marketed and sold those lots to countless individual purchasers, all of whom had no access to their property but for [the Peterson Road]." Hall argues that permission to Diversified is further supported because "there was also evidence from which the jury could infer that real estate agents and prospective purchasers of [Diversified's] property frequently used the road." Hall also argues that reliance by others was both foreseeable to Peterson and was reasonable.

¶37   We disagree. To begin, there is no evidence anywhere in the record that Peterson gave Diversified express permission to use the road and Hall points to none. Instead, Hall relies on Peterson's silence, arguing that the use of the road was so pervasive—Diversified allegedly used the Peterson Road to "transport heavy machinery, sales staff, and potential buyers to the property"—that the jury could reasonably infer that Peterson "would have known" that the Spur Road was being built and that the Peterson Road was being regularly and frequently used to facilitate that work.

¶38   Peterson does not argue on appeal, nor did he argue at trial, that the permission element for an easement by estoppel cannot exist here because there was no overt act by Peterson granting implied permission. We therefore have no occasion to reverse on that particular ground, and we presume for purposes of this appeal that permission may be granted by silence. *See supra* ¶ 31. Even so, the evidence presented at trial does not show that Peterson "would have known" about Diversified's

use, as the trial court determined, and thus permitted Diversified to repeatedly use the Peterson Road to develop properties that it sold to "countless individual purchasers."

¶39    The evidence going to Diversified's construction activity beyond Buckhorn Flats is: (1) the existence of a Spur Road, which would take a machine to grade, that provides some access to lots Diversified sold; and (2) Smith's testimony that, on a single occasion, he saw a bulldozer in an area where Diversified said it was selling lots.[14] Neither documentary evidence nor testimony from any Diversified witness was presented at trial demonstrating that Diversified built the road or brought a bulldozer to its property by use of the Peterson Road. No one testified that they saw construction equipment actually doing any work. This evidence, viewed in a light most favorable to the verdict, at best shows that it is likely that Diversified conducted some activity beyond Buckhorn Flats. And because the only road access to the area is the Peterson Road, Diversified would likely have used the Peterson Road to conduct that activity.

¶40    But even assuming, based upon the scant circumstantial evidence here, that Diversified built the Spur Road and brought up a bulldozer by using the Peterson Road, an inference that Peterson gave Diversified implied permission to use the

---

14. Hall testified that Diversified built the Spur Road. However, Hall did not "see them build" the Spur Road, nor did Hall have any documentation showing that Diversified built the Spur Road. Hall's testimony is speculative, *see Speculation*, Black's Law Dictionary (10th ed. 2014) ("The act or practice of theorizing about matters over which there is no certain knowledge."), and provides "no competent evidence that would support" an inference either that Diversified built the road or that Peterson understood the purpose for which it was built, *see Merino v. Albertsons, Inc.*, 1999 UT 14, ¶ 3, 975 P.2d 467.

Peterson Road is unsupported because the evidence does not show that Diversified's alleged use of the road was sufficiently pervasive to permit an inference that Peterson would have known about the activity and acquiesced in it. *See generally Martin v. Cockrell*, 335 S.W.3d 229, 238–39, 238 n.15 (Tex. App. 2010) (holding that the evidence was insufficient to show that a landowner had a duty to make any representation, and therefore was insufficient, as a matter of law, to support an easement by estoppel where there was no evidence that a landowner was aware of a user's reliance on a pasture road to make improvements to property beyond the road). We acknowledge that mere silence can constitute implied permission for an estoppel, but where silence is the basis for implied permission the circumstances must be compelling, showing either "a legal duty to speak," or "something willful or culpable in the silence."[15] *See First Inv. Co. v. Andersen*, 621 P.2d 683, 687 (Utah

---

15. Several cases have reviewed silence as a basis for estoppel and held that, as a matter of law, it did not establish estoppel. *See IHC Health Services, Inc. v. D & K Mgmt., Inc.*, 2003 UT 5, ¶¶ 11–12, 73 P.3d 320 (holding, in a case where a party argued that IHC should have been estopped from requiring on-time rent payments, that inaction for one month was insufficient to establish estoppel because more than inaction or silence is required); *First Inv. Co. v. Andersen*, 621 P.2d 683, 687–88 (Utah 1980) (holding that the defendants' failure to respond to the plaintiff's three demand letters and threat of collection services over roughly one and a half years did not establish a basis to invoke estoppel); *see also Storms v. Tuck*, 579 S.W.2d 447, 450–53 (Tex. 1979) (holding that, in the context of an expanded use of an existing easement, silence did not create an easement by estoppel where, despite the fact that a landowner saw construction equipment building a road, evidence did nothing to indicate whether the landowner understood the planned use of the road); *Ramsey v. Champion*, No. 10-12-00394-CV, 2014 WL 1882758, at

(continued…)

1980) (citation and internal quotation marks omitted). Again, it is no small thing to acquire an interest in the land of another through equitable estoppel, and the circumstances supporting the estoppel should be certain, precise, and clear. *See McClung v. Ayers*, 352 S.W.3d 723, 729 (Tex. App. 2011).

¶41    First, the existence of the Spur Road provides no evidence about the volume of traffic or pervasiveness of Diversified's alleged use. Despite the fact that the excavating contractors agreed and testified that "it would take a machine" to build the road, they did not testify that it would take more than a single machine or more than a single day or even a few hours to cut a dirt road, much less that it could only have been built by Diversified as opposed to one or more of its buyers, for example. It would be crucial for a factfinder to weigh how often machines were moving across the Peterson Road, whether Peterson actually observed this activity, or how often Peterson would have been in a position to notice the construction activity. None of these facts are in evidence. For all the evidence shows, the Spur Road may have been a months-long project or may have been built in a day (or in hours) when Peterson was not there to object. And while we view the evidence in a light most favorable to the jury verdict, we do not infer facts unsupported by the evidence. *See State v. Cristobal*, 2010 UT App 228, ¶ 16, 238 P.3d 1096 ("When the evidence supports more than one possible

---

(…continued)
*4–5 (Tex. App. May 8, 2014) (holding that facts supporting easement by estoppel were legally insufficient because, even though the landowners saw improvements being made beyond their property by use of a road, a duty to speak did not arise where the user "has equal access to the facts" regarding rights of access.); *cf. Soter's, Inc. v. Deseret Fed. Sav. & Loan Ass'n*, 857 P.2d 935, 942 (Utah 1993) (announcing the standard for waiver and that "the intent to relinquish a right must be distinct").

conclusion, none more likely than the other, the choice of one possibility over another can be no more than speculation[.]").

¶42   We next examine the evidence of a bulldozer on Diversified's property. Even assuming that Diversified used the Peterson Road to deliver a bulldozer to the lots it was selling, there is no evidence that Peterson was aware of it. And because Hall relies on implied knowledge, there must be a showing that Diversified's use of the Peterson Road was so significant or pervasive that Peterson would have known about it and therefore implicitly granted permission by his silence. This single bulldozer sighting, even in light of the existence of the Spur Road, does not demonstrate pervasive use such that it can be inferred that Peterson gave Diversified permission to use the Peterson Road. On the contrary, it is equally likely that Diversified simply used the road without permission.

¶43   Next, the record does not support a finding that "real estate agents and prospective purchasers of [Diversified's] property frequently used the road." Smith testified that he had an unidentified representative from Diversified drive him to his property one time. Aside from that testimony, there are only two possible references to real estate agents in evidence, neither of which support the proposition Hall asserts.

¶44   The first is from Sorensen, who testified that the first time he visited his property with his real estate agent, he "hiked in," not that he drove directly to his property. Because he "hiked in" to the property, there is no basis to conclude that he must have used the Peterson Road. Therefore, Sorensen's testimony does not support an inference that sales staff and real estate agents frequently used the Peterson Road.

¶45   The second possible reference to a real estate agent is from the deposition testimony of Matthews that was read at trial. There, the questioning attorney interjected "Did a real estate" during Matthews's answer to a question about who was

present on a trip to visit property beyond the Peterson Road. Even assuming that the attorney was asking whether a real estate agent accompanied Matthews when he visited his property, Matthews's response was not an affirmative response to that question because it did not include the name of a real estate agent but the name of another property owner. Matthews was simply remembering which owners were present.

¶46   Thus, only Smith testified of a single instance where a representative from Diversified drove him to the property, and that testimony does not support Hall's assertion that Diversified's real estate agents and sales staff frequently used the road, much less that they did so with Peterson's knowledge and tacit permission. Smith's testimony never mentioned seeing Peterson, and therefore establishes nothing about the likelihood that Peterson ever knew, or "would have known," that a representative from Diversified drove Smith to his property once in the 1970s.

¶47   Finally, no other testimony about the use of the Peterson Road supports an inference of Diversified's "extensive development and sales campaign," as Hall asserts. The testimony at trial showed that other people—not Diversified— used trucks or ATVs on the road for recreational purposes, for the deer hunt back in the 1950s, and for sporadic visits to access property beyond the Peterson Road. There is no testimony from which a jury could reasonably infer that the Peterson Road was regularly used by Diversified's sales staff and potential buyers.

¶48   The mere showing that the Spur Road exists and appears to provide access to some of the lots that Diversified sold, that a bulldozer was seen one time south of Peterson's property, and that a Diversified representative drove Smith to his property once does not support an inference that Peterson permitted Diversified to use the Peterson Road to build the Spur Road as

well as other "facilities"[16] as part of a new development. Accordingly, there was insufficient evidence that Peterson gave permission, implied or otherwise, for Diversified to use the Peterson Road. Because all three elements of an easement by estoppel must be proven, the claim fails for this reason alone and the directed verdict should have been granted. However, because the trial court addressed all three elements of easement by estoppel, and in the event of further review, we proceed to review the sufficiency of the evidence on the other elements as well.

¶49　Hall relies on the above arguments not only to show implied permission by Peterson, but also to establish that Peterson could foresee that Diversified would reasonably rely on the purported permission and that Diversified would substantially change its position reasonably believing that permission would not be revoked.

¶50　Consistent with the analysis above, we are similarly unconvinced that the evidence shows circumstances where it is foreseeable by Peterson that Diversified would substantially change circumstances, believing that permission would not be revoked.

¶51　Hall does not argue that Peterson had a duty to notify Diversified (or anyone else) that they could not use the Peterson Road. Where, as here, a party relies on permission by silence, an analysis of the reasonableness of that reliance must take into account that it is silence, not an express grant oral or otherwise,

---

16. There was no evidence adduced at trial of any facilities whatsoever beyond Buckhorn Flats. The testimony at trial was that whatever dirt road exists beyond Buckhorn Flats is a mountain road, overgrown by trees and brush. In particular, no witness testified that the Spur Road showed evidence of frequent use.

being relied upon. Because Peterson had no apparent duty to restrict access to his land, it was unreasonable for Diversified to rely on Peterson's silence. *See RJW Media, Inc. v. CIT Group/Consumer Fin., Inc.*, 2008 UT App 476, ¶ 34, 202 P.3d 291 ("Because CIT had no duty to inform RJW of a possible procedural defect, not only was it unreasonable for RJW to rely on CIT's silence, but CIT's silence cannot be construed as an inconsistent act sufficient to establish an equitable estoppel claim."). Consequently, the trial court erred in concluding that it would be reasonable to foresee that Diversified would rely on Peterson's failure to restrict use of the Peterson Road, because Peterson was under no obligation to act.

¶52    Also, no one from Diversified, through hearsay or otherwise, testified that it relied on the Peterson Road for access. Further, there is no evidence that Peterson was aware that Diversified or anyone else used the road. For it to be reasonably foreseeable that the users would rely on implied permission, the traffic on the Peterson Road would have had to have been so significant that, although Peterson was not aware of any of it, he should have been aware under the circumstances. *See Martin v. Cockrell*, 335 S.W.3d 229, 238 (Tex. App. 2010) (citation and internal quotation marks omitted) ("The duty to speak does not arise until the silent party is himself aware of the facts."). This showing of pervasiveness is exactly what is lacking here. The evidence does not demonstrate a bustling real estate enterprise, but instead shows, at best, and construing the evidence in Hall's favor, meager use by Diversified coupled with sporadic and recreational use by entities other than Diversified. The mere existence of the Spur Road and the paltry use of that road demonstrated at trial are insufficient to show both that Diversified relied on the Peterson Road and that Peterson could foresee that Diversified would change its position based on that reliance.

¶53   In sum, the evidence shows (1) the existence of a Spur Road, which would take a machine to grade, that provides some access to lots that Diversified sold, (2) that Smith saw a bulldozer in an area south of Peterson's property once in the 1970s, and (3) that an unidentified representative from Diversified drove Smith to his lot once in the 1970s. To conclude, based on this evidence, that Peterson gave permission to Diversified to use the Peterson Road to build and develop a new mountain community, and thus to diminish Peterson's property rights by estoppel, is not reasonable. We conclude, as a matter of law, "that reasonable minds would not differ on the facts to be determined from the evidence presented." *See Mahmood v. Ross*, 1999 UT 104, ¶ 18, 990 P.2d 933 (citation and internal quotation marks omitted). Therefore, Peterson's motion for a directed verdict should have been granted with regard to Diversified. *See id.* We acknowledge that, while trying to view the evidence in a light favorable to Hall, the trial court concluded that "[i]t would be hard for [Peterson] not to know [the Spur Road was] being built" and that based on that knowledge, "[i]t would be reasonable for him to foresee or to believe that others intended to use that road to access that spur road that was being built." However, even when viewed in a light favorable to Hall, the evidence cannot support those conclusions.

B.    Gobel

¶54   Peterson asserts, correctly, that there was no evidence presented at trial showing the historical ownership of the Gobel properties. Hall argues in response that the jury could infer from the evidence that Gobel purchased his properties from Diversified. Further, Hall argues that "[e]ven though [Gobel] did not testify at trial, a jury could nevertheless reasonably infer that [Hall] had established his easement by estoppel claim with respect to [Gobel's] lots through [Diversified]." We disagree. The paucity of evidence leaves no room for such an inference. Moreover, given our disposition on the easement by estoppel

through Diversified, *see supra* Part II.A., we likewise conclude that, even if it were established that Diversified sold the lots to Gobel, the easement by estoppel claim through Gobel as a predecessor in interest fails.

C.    Smith

¶55    The evidence does not support an easement by estoppel through Smith. Hall argues that "[t]he Smiths purchased their property from [Diversified], and [Peterson] was on notice that [Diversified] was developing and marketing lots within the development to individual[s] such as the Smiths. This evidence allowed the jury to reasonably infer that [Peterson] granted express or implied permission to the Smiths to use the [road]." Not really. There is no evidence to support such an inference. Rather, this is a repackaged argument, turning on the proposition that Peterson's implied permission to Smith is dependent on the implied permission allegedly given to Smith's predecessor in interest, Diversified. Given our analysis of the insufficiency of the evidence as it relates to Diversified, *see supra* Part II.A., we reject Hall's argument here as well.

¶56    Hall primarily relies on Diversified to show that Peterson gave Smith implied permission to use the Peterson Road. But insofar as Hall relies directly on Smith, the evidence does not show that Smith had an easement by estoppel. Smith visited his property three times after acquiring it in the early 1970s; he drove there once with someone from Diversified just after agreeing to purchase the property, and he drove there twice more before roughly 1985. Smith did not testify that he purchased the property relying on permission from Peterson, or that he even knew he was crossing Peterson's property.[17] There

---

17. Smith and others may have believed that they had a right to drive all the way to their respective lots, but that has nothing to

(continued…)

is no evidence that Peterson ever gave permission to Smith or even that Peterson knew that Smith existed. These three visits over a span of roughly forty years cannot show that Peterson implicitly gave permission to Smith to use the Peterson Road, much less that it would be foreseeable to Peterson that Smith would rely on that permission. We conclude, as a matter of law, "that reasonable minds would not differ on the facts to be determined from the evidence presented," and therefore conclude that Peterson's motion for a directed verdict should have been granted with regard to the lots owned by Smith. *See Mahmood v. Ross*, 1999 UT 104, ¶ 18, 990 P.2d 933 (citation and internal quotation marks omitted).

D.    Thomas

¶57    Our analysis of the evidence pertaining to Thomas as a predecessor in interest is identical to our above analysis pertaining to Smith. Hall again argues the jury could reasonably infer implied permission given to Thomas as a successor to Diversified. No such inference is reasonable.

¶58    Like Smith, Thomas's own use of the road similarly fails to establish an easement by estoppel. Thomas visited the property "three, maybe four" times since the 1970s. There is no evidence that Peterson ever gave permission to Thomas or ever knew that Thomas existed. Thomas did not testify that she purchased the property relying on permission from Peterson, nor that she even knew she was crossing Peterson's property. Her visits are not evidence of circumstances suggesting that Peterson implicitly gave permission to use his land, or that it would be foreseeable that Thomas would rely on that permission, such that Peterson's property rights are diminished

─────────────────────

(…continued)
do with permission granted by Peterson, nor Peterson's ability to foresee reliance on that privately held belief.

by the creation of an easement. "[R]easonable minds would not differ on the facts to be determined from the evidence presented," and Peterson was entitled to a directed verdict. *See Mahmood*, 1999 UT 104, ¶ 18 (citation and internal quotation marks omitted).

E.     Cumulative Effect of the Evidence

¶59     The sum of the evidence shows, at best, (1) the existence of an simple dirt road, which would take a machine to grade, with no evidence of how long it would take to grade it, that provides access to some lots that Diversified sold, (2) that an unidentified representative from Diversified drove Smith to his lot once in the 1970s, (3) that Smith saw a bulldozer in an area south of Peterson's property once in the 1970s, and (4) that people have variously used trucks or ATVs on the road for recreational purposes, for the deer hunt back in the 1950s, and for isolated and sporadic visits to access property beyond the Peterson Road. The above analysis shows that the elements argued at trial for easement by estoppel—(1) permission, (2) foreseeability by the landowner that the user will rely on that permission, and (3) substantial change of position by the user based on the belief that permission will not be revoked—can neither be met by the evidence concerning Hall's own use of the Peterson Road, nor by his predecessors' use of the Peterson Road. Particularly, the evidence cannot show that Peterson granted permission, express or implied, to Hall or any of his predecessors in interest to access property beyond Buckhorn Flats because the evidence does not establish actual permission and, as to implied permission, the evidence demonstrates that the use was so minimal over the last forty years that implied permission cannot reasonably be inferred.[18]

---

18. If pervasive use had been shown, it might be reasonable to infer that Peterson gave permission, at least impliedly, as it

(continued…)

¶60 To suggest that an easement by estoppel is legally supported through a showing of various entities' cumulative use of property that was generally open for many years, the notion is misguided under the facts of this case. As noted above, "[t]he gravity of a judicial means of acquiring an interest in land of another solely by parol [evidence] requires that equitable estoppel be strictly applied, and the estoppel should be certain, precise and clear." *McClung v. Ayers*, 352 S.W.3d 723, 729 (Tex. App. 2011) (footnote, citations, and internal quotation marks omitted). An easement by estoppel was not created merely because Peterson, as an owner of recreational property, failed to post guards or otherwise preclude trespassers from traversing his property when no evidence suggests he was present to object. It is unreasonable to interpret Peterson's silence here as permission, and it would be unreasonable to hold that the sporadic use of the Peterson Road, as demonstrated by the evidence, is "certain, precise and clear" enough to establish an easement. *See id.* (citation and internal quotation marks omitted).

## III. Remaining Claims

¶61 Peterson also appeals the trial court's ruling as to (1) Peterson's denied judgment notwithstanding the verdict, (2) the scope of the easement, and (3) the prevailing party at trial. Because we hold that the trial court erred in denying Peterson's directed verdict, the issue of a judgment notwithstanding the verdict is moot. Likewise, we need not review the scope of the easement. And because we reverse the trial court's denial of Peterson's motion for a directed verdict, Hall is no longer the prevailing party.

_____

(…continued)
would be fair to assume he saw traffic on multiple occasions on the Peterson Road and never said anything about it, thereby impliedly giving permission to its continuation.

CONCLUSION

¶62     The evidence at trial was insufficient to establish an easement by estoppel as to Hall or any of his predecessors in interest. We reverse the trial court's denial of Peterson's directed verdict motion and remand to the trial court for proceedings consistent with this ruling.

———————