**2023 UT App 151**

## THE UTAH COURT OF APPEALS

JENCO LC, DEAN GARDNER INVESTMENT LC, AND
F.M. SNOW PROPERTIES LLC,
Appellants,
*v.*
SJI LLC,
Appellee.

Opinion
No. 20220892-CA
Filed December 14, 2023

Fifth District Court, St. George Department
The Honorable Jeffrey C. Wilcox
No. 120500362

Bryan J. Pattison,
Attorney for Appellants

Erik A. Olson and Christopher D. Ballard,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES RYAN D. TENNEY and AMY J. OLIVER concurred.

HARRIS, Judge:

¶1      This case involves a dispute about the rightful ownership of an option (the Option) to purchase certain property. SJI LLC (SJI) contends that it owns the Option pursuant to a 2010 assignment from the Option's previous owner, Ledges Partners LLC (Ledges Partners). SJI's litigation opponents—JENCO LC, Dean Gardner Investment LC, and F.M. Snow Properties LLC (collectively, JENCO)—contend that the 2010 assignment was an invalid fraudulent transfer and that they own the Option after purchasing Ledges Partners' interest in it in a 2017 execution sale. After a one-day bench trial, the court concluded that the 2010 assignment was not a fraudulent transfer and that SJI therefore

owned the Option. JENCO appeals, asserting that the trial court's fraudulent transfer analysis contained legal errors. We agree with JENCO and therefore vacate the trial court's decision and remand the case for additional proceedings.

BACKGROUND

¶2     In the early 2000s, JENCO owned land in the area now known as "The Ledges," north of St. George, Utah. Beginning in 2004, JENCO entered into a series of agreements with Ledges Partners by which Ledges Partners purchased successive parcels of JENCO's land for purposes of development; the purchases were often at least partially seller-financed by JENCO. After each purchase of property from JENCO, Ledges Partners would typically transfer title to the property into separate single-asset affiliate entities in which Ledges Partners' managers were also named as managers. Ledges Partners did this to guard against "cross-liability"—to prevent any problems with any one portion of the development from affecting other portions—and always notified JENCO of any transfers.

¶3     For a few years, the parties operated successfully under this arrangement, but the economic recession of 2007–2008 changed matters; at that point, sales of developed lots ceased "virtually overnight," throwing the project into "dire straits" and causing the parties to reassess their arrangement. In 2010, after lengthy negotiations, JENCO and Ledges Partners entered into a series of "settlement" agreements that redefined their arrangement and placed certain additional financial obligations on Ledges Partners. In particular, one of the new agreements specified that Ledges Partners owed JENCO more than $210,000 from a prior transaction.

¶4     Another of the new agreements entered into in 2010 was captioned "New Real Property Option Agreement" (the Option Agreement). Under this agreement, JENCO granted Ledges Partners an option—the Option—to purchase 67.5 acres of land

located next to the Ledges Golf Course. Due to the location of the property at issue, the Option is apparently quite valuable; at one point, one of Ledges Partners' managers estimated that the Option was worth $29.7 million.

¶5     One of the terms of the Option Agreement discussed the extent to which Ledges Partners could assign its rights thereunder to another entity. On this point, the parties agreed that, as a general matter, Ledges Partners could not assign its rights under the Option Agreement without JENCO's consent, but this provision had a noteworthy exception: Ledges Partners was allowed to "assign its rights hereunder . . . to one or more of [its] Affiliates, as long as such Affiliate . . . assumes all of [Ledges Partners'] obligations with respect to the property so transferred." The term "Affiliate" was defined in the Option Agreement to include any company in which any member of Ledges Partners has an ownership interest. The Option Agreement contained no provision requiring Ledges Partners to notify JENCO of any assignment to an "Affiliate."

¶6     In December 2010, just a few months after entering into the Option Agreement, Ledges Partners assigned—in a document we refer to as "the Assignment"—its rights under the Option Agreement, including the Option, to SJI, an entity controlled by one of Ledges Partners' managers (Manager). At the time, Ledges Partners was financially indebted to JENCO and, in the words of Manager, was "out of business." Manager was the only one of Ledges Partners' managers who was affiliated with or had any interest in SJI. And Manager was the only person to execute the Assignment, doing so on behalf of both Ledges Partners and SJI. Ledges Partners received no monetary consideration in return for the Assignment; the only consideration involved was SJI's promise "to perform and be bound by all the terms, conditions, obligations and liabilities required to be paid or performed by [Ledges Partners] under the" Option Agreement. At the time, Ledges Partners did not notify JENCO that it had assigned its rights under the Option Agreement to SJI.

¶7 In 2012, JENCO filed a lawsuit against Ledges Partners and eventually obtained a judgment in the amount of $382,787.08. In an effort to satisfy this judgment, JENCO sought to locate and execute upon Ledges Partners' assets; in particular, it applied for and obtained a writ of execution allowing it to execute upon Ledges Partners' interest in the Option Agreement, including the Option. A constable's sale was set for June 13, 2017. The day before the sale, SJI—through a letter from its counsel—notified JENCO of the Assignment and asserted that it was the rightful owner of the Option. SJI also recorded a "Notice of Interest" against the property subject to the Option Agreement. JENCO learned of SJI's claimed interest in the Option for the first time upon receipt of counsel's letter. But despite SJI's notice, the constable's sale proceeded as scheduled, and JENCO—through a $100 credit bid—purchased Ledges Partners' interest in the Option Agreement.

¶8 A few weeks after the sale, Manager sent a letter—written on Ledges Partners letterhead—to JENCO. In that letter, Manager implored JENCO to cease its efforts to execute on or possess the Option, stating as follows: "What you are now attempting to do with the [Option], *the only remaining asset Ledges* [*Partners*] *has*, goes far beyond the boundaries of appropriate and fair business practices and is just morally and ethically wrong." (Emphasis added.) Manager asked JENCO to undertake "constructive reflection" about "the inequities that exist between" JENCO and Ledges Partners, and he expressed his "hope" that such reflection "would lead to [JENCO's] withdrawal from any further pursuits" regarding the Option.

¶9 Soon after acquiring Ledges Partners' interest in the Option Agreement and learning of SJI's asserted interest, JENCO made two post-judgment litigation maneuvers. First, it sought and obtained leave to conduct additional "post-judgment discovery" regarding "Ledges Partners' assets and claimed transfer of assets." Second, it sought and obtained leave to join SJI as a "defendant in interpleader" in the case so that the district court could make a decision—with all interested parties present—

regarding the validity of the Assignment. JENCO did not, however, file a complaint or other pleading against SJI setting forth any particular causes of action.

¶10   Once SJI was present in the case, JENCO filed a motion asking the trial court to confirm the validity of the 2017 constable's sale and to extinguish any adverse claims to the Option, including SJI's. The court granted JENCO's motion, determining "that any interest SJI claimed in the [Option] was extinguished because it did not reply to the writ of execution" before the constable's sale occurred. *See JENCO LC v. Ledges Partners LLC*, 2020 UT App 42, ¶ 7, 463 P.3d 64. SJI appealed that ruling and—in this case's first visit to the appellate courts—we determined that, because the writ of execution only authorized the sale of Ledges Partners' interest in the Option Agreement, "any interest SJI may have had . . . could not have been conveyed to JENCO" at the constable's sale. *Id.* ¶ 14. Accordingly, we remanded the case to the trial court "for a determination of whether [the Assignment] conveyed" Ledges Partners' interest in the Option Agreement to SJI. *Id.*

¶11   On remand, the parties engaged in additional discovery, and then the court set the matter for a bench trial. In briefs filed before the start of the trial, JENCO asserted that the Assignment was "a fraudulent transfer" under Utah law, citing section 25-6-5 of the pre-2017 Utah Code.[1] JENCO did not invoke section 25-6-6 of the Utah Code.

¶12   At the bench trial, the court heard from only two witnesses: JENCO's manager and Manager. Both witnesses testified about the events outlined above. In addition, Manager was asked about a 2016 email exchange between Manager and one of Ledges Partners' investors. The investor initiated the email chain, inquiring whether Ledges Partners still owned any property at

---

1. As we explain later, *see infra* note 4, the relevant sections of the Utah Code were materially amended in 2017. The parties here agree, however, that the pre-2017 version of those statutory sections is the version that applies in this case.

the Ledges. Manager responded by stating that "[a]n affiliate of [Ledges Partners] has the rights to roughly 64 acres of property."[2] After the investor asked about the affiliate and, in particular, whether Ledges Partners' investors still had "the rights to this 64 acres," Manager replied that the affiliate was merely holding the property "to limit cross-liability," that Ledges Partners' rights in the Option Agreement still existed, and that the Option was the company's "only remaining asset."

¶13 In closing arguments, JENCO argued that the Assignment was a fraudulent transfer, and it asserted that several "badges of fraud" were present indicating that the Assignment had been made to "hinder, delay, or defraud" Ledges Partners' creditors, including JENCO. In response, SJI argued that the Assignment had not been made to defraud creditors but, instead, was a perfectly legal maneuver that was specifically authorized by the terms of the Option Agreement. In particular, SJI asserted that Ledges Partners had—during negotiations over the terms of the Option Agreement—bargained for the right to make exactly that kind of assignment, and that JENCO "wrote . . . off" the right to complain about it "by not building that into [the] contract."

¶14 At the close of the trial, the court made an oral ruling in favor of SJI, noting that the Option Agreement allowed the Assignment and finding that Manager "did what he needed to do to . . . protect his investors." On that basis, the court found "that the assignment was not a fraudulent transfer."

¶15 About a month later, with the assistance of counsel, the court entered a written order memorializing its oral ruling. As an initial matter, the court found that both JENCO's manager and

---

2. In its findings, the trial court noted that Manager mistakenly referred to the amount of property subject to the Option Agreement as "64 acres" rather than 67.5 acres. No party disputes that, despite this acreage-related mistake, Manager was referring to the Option Agreement in this 2016 correspondence.

Manager had testified credibly. The court included a discussion of the economic events that led to the current dispute, and it made a finding that, during the recession, "[s]mart developers and property owners took measures to survive and protect themselves from the negative effects of the recession." The court found that both JENCO and Ledges Partners were "sharp, intelligent developers," and the court observed that the recession had put Ledges Partners "in a difficult position" that required the company to "take measures to try to keep the development going and serve [its] investors." And the court concluded that "nothing" in the evidence "would lead it to believe that" Ledges Partners "intended to defraud anyone" by assigning the Option to SJI; indeed, it specifically found that Ledges Partners' "intent in executing the Assignment was to protect Ledges [Partners'] investors' interests and ensure the viability of the [Option] in the wake of the recession." Thus, the court concluded that "JENCO has not met its burden of proving by clear and convincing evidence that the Assignment was a fraudulent transfer."

¶16    Along the way, the court found that "JENCO [had] not proven that any badge of fraud existed here," although its ruling contained analysis of only two such badges. The court discussed whether Ledges Partners had notified JENCO of the Assignment, and found that it had not (at least not until 2017), but concluded that this did not weigh against Ledges Partners because, under the terms of the Option Agreement, Ledges Partners "had no legal duty to notify JENCO" of the Assignment "or to seek its consent." The court also discussed the extent to which SJI gave consideration for the Assignment, and it concluded that—because SJI agreed to assume Ledges Partners' obligations under the Option Agreement—there had been "adequate consideration" for the Assignment. In so doing, however, the court did not discuss whether this consideration constituted reasonably equivalent value for the asset assigned.

¶17    Ultimately, based on its determination that the Assignment was not a fraudulent transfer, the court concluded that SJI was—

by virtue of that Assignment—the rightful owner of the Option and that the 2017 constable's sale of Ledges Partners' interest in the Option Agreement had not conveyed anything to JENCO. The court therefore dismissed with prejudice "JENCO's fraudulent transfer claim" and entered judgment in favor of SJI.[3]

ISSUES AND STANDARDS OF REVIEW

¶18 JENCO now appeals, raising a challenge to the court's rejection of its fraudulent transfer claim. As we understand it, JENCO's appeal includes both a challenge to some of the court's factual findings as well as an allegation that the court's analysis was infected with certain legal errors. In assessing such a challenge in a fraudulent transfer case, "we review questions of fact for clear error and questions of law for correctness." *Eskelsen v. Theta Inv. Co.*, 2019 UT App 1, ¶ 18, 437 P.3d 1274. "The existence of fraudulent intent is ordinarily considered a question of fact . . . ." *Lakeside Lumber Products, Inc. v. Evans*, 2005 UT App 87, ¶ 9, 110 P.3d 154 (quotation simplified). "A finding is clearly erroneous when the court either failed to consider all of the facts or reached a decision against the clear weight of the evidence." *In re K.K.*, 2023 UT App 14, ¶ 5, 525 P.3d 526 (quotation simplified), *cert. denied*, 531 P.3d 731 (Utah 2023).

---

3. The court also rejected a procedural objection, lodged by SJI, to JENCO's fraudulent transfer claim. In its trial brief, SJI argued—citing *Brigham Young University v. Tremco Consultants, Inc.*, 2007 UT 17, 156 P.3d 782—that JENCO's claim failed because JENCO had not filed and served any actual complaint against SJI setting forth a fraudulent transfer claim. After trial, JENCO moved to amend its pleadings, pursuant to rule 15(b) of the Utah Rules of Civil Procedure, to conform them to the evidence presented and effectively add a fraudulent transfer claim, and the court granted that motion. No party takes issue with that ruling in this appeal.

ANALYSIS

¶19    In Utah, as in most states, it is unlawful for debtors to transfer their assets away with the intent to "hinder, delay, or defraud" their creditors. *See* Utah Code § 25-6-5(1)(a) (2016); *see also Butler v. Wilkinson*, 740 P.2d 1244, 1260 (Utah 1987) ("The law has long held that transfers of property designed to place a debtor's assets beyond the reach of the debtor's creditors are void as to the creditors."). Utah's statute forbidding these so-called "fraudulent transfers" is "a codification of the common law," *see National Loan Invs., LP v. Givens*, 952 P.2d 1067, 1069 (Utah 1998), and was patterned after the Uniform Fraudulent Transfer Act, a proposed uniform law derived from parts of the federal bankruptcy code, *compare* Uniform Fraudulent Transfer Act §§ 4–5 (Unif. L. Comm'n 1984), *with* 11 U.S.C. § 548, and that has been adopted, in some form, in nearly all American jurisdictions.[4] In

---

4.    The Uniform Fraudulent Transfer Act was promulgated in 1984 by the Uniform Law Commission and, as of 2015, had been adopted by "[f]orty-five states, the District of Columbia, and the U.S. Virgin Islands." *Uniform Voidable Transactions Act, (2014 Amendments),* Unif. L. Comm'n, https://www.uniformlaws.org/viewdocument/enactment-kit-89?CommunityKey=64ee1ccc-a3ae-4a5e-a18f-a5ba8206bf49&tab=librarydocuments [https://perma.cc/B63M-EYDL]. In 2014, this uniform law was amended to "address a few narrowly defined issues," and was also renamed the "Uniform Voidable Transactions Act" because the original title was deemed somewhat "misleading" in that fraud is not a "necessary element of a claim" under the law. *Id.* In 2017, the Utah Legislature followed suit and amended, repealed, renumbered, and renamed its version of the law, which is now known as the Utah Voidable Transactions Act. *See* Uniform Voidable Transactions Act, ch. 204, § 2, 2017 Utah Laws 977, 979; *see also* Utah Code § 25-6-101. The parties to this appeal all agree that the pre-2017 version of the statute should be applied here because all relevant events— including, most notably, the 2010 Assignment—took place prior

(continued…)

2010, when the Assignment was made, the governing Utah statute was known as the Utah Fraudulent Transfer Act, and we refer to that statute as the "UFTA."

¶20 The purpose of the UFTA "is to prevent insolvent debtors from transferring all of their assets to avoid their creditors' claims, and to provide a means whereby creditors can collect against a fraudulently transferred asset." *Porenta v. Porenta*, 2017 UT 78, ¶ 13, 416 P.3d 487; *see also* Utah Code §§ 25-6-5, -6 (2016). Our supreme court has instructed that, in light of the UFTA's "remedial" purpose, the statute "should be liberally construed." *National Loan Invs.*, 952 P.2d at 1069.

¶21 In establishing a claim under the UFTA, the first and most basic prerequisite is demonstrating that a debtor-creditor relationship exists. *See Bradford v. Bradford*, 1999 UT App 373, ¶ 14, 993 P.2d 887 ("A fraudulent transfer in Utah first requires a creditor-debtor relationship."), *cert. denied*, 4 P.3d 1289 (Utah 2000). Once such a relationship has been established, there are two pathways by which a fraudulent transfer claim may be raised, one of which is applicable only "if the creditor's claim arose *before* the transfer," and one of which is available regardless of whether "the creditor's claim arose *before or after* the transfer." *See Tolle v. Fenley*, 2006 UT App 78, ¶ 20, 132 P.3d 63; *see also* Utah Code §§ 25-6-5, -6 (2016). In this case, JENCO made a claim, at the trial court level, under only one of these two pathways: the one potentially applicable regardless of whether the creditor's claim arose before or after the transfer. *See* Utah Code § 25-6-5 (2016). And even with regard to that pathway, JENCO limited its claim to a particular statutory subsection. *See id.* § 25-6-5(1)(a). Thus, we limit our analysis to that specific subspecies of UFTA claim.

¶22 The UFTA considers a transfer fraudulent, and voidable at the creditor's request, if "the debtor made the transfer . . . with

---

to the effective date of the 2017 statutory amendment. Accordingly, unless otherwise noted, we cite and apply the pre-2017 version of Utah's statute.

actual intent to hinder, delay, or defraud any creditor of the debtor." *Id.* §§ 25-6-5(1)(a), -8(1)(a). Under the pre-2017 statute, the creditor—here, JENCO—was required to prove its claim, including the existence of fraudulent intent, "by clear and convincing evidence." *See Jones v. Mackey Price Thompson & Ostler*, 2020 UT 25, ¶ 50, 469 P.3d 879. "The existence of fraudulent intent [under the UFTA] is a factual question, which may be inferred from all of the attendant circumstances." *Selvage v. J.J. Johnson & Assocs.*, 910 P.2d 1252, 1262 (Utah Ct. App. 1996).

¶23 To assist in the assessment of a debtor's intent, and in an effort to enumerate some of the "attendant circumstances" that may arise in fraudulent transfer situations, the UFTA provides a list of non-exclusive factors, known as "badges of fraud," *see id.* at 1261–62, to which courts "may" give "consideration" in evaluating a debtor's "actual intent," *see* Utah Code § 25-6-5(2) (2016). Pursuant to this list, a court may consider whether:

> (a) the transfer or obligation was to an insider;
>
> (b) the debtor retained possession or control of the property transferred after the transfer;
>
> (c) the transfer or obligation was disclosed or concealed;
>
> (d) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
>
> (e) the transfer was of substantially all the debtor's assets;
>
> (f) the debtor absconded;
>
> (g) the debtor removed or concealed assets;

(h) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(i) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(j) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(k) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*Id.*

¶24  In this case, there is no dispute that the parties had a debtor-creditor relationship at the time of the 2010 Assignment. Indeed, one of the settlement agreements entered into earlier in 2010 specified that Ledges Partners owed JENCO more than $210,000 from a prior transaction. And JENCO later obtained a judgment against Ledges Partners in the amount of $382,787.08, which has yet to be satisfied. Thus, the threshold element of the UFTA is satisfied here.

¶25  The primary issue at trial, and here on appeal, is whether Ledges Partners had an impermissible "intent" in executing the Assignment. "Intent" is a key element of a UFTA claim under section 25-6-5(1)(a), and a transfer can be avoided pursuant to this provision if it was made with the "actual intent to hinder, delay, or defraud any creditor of the debtor."

¶26  After considering the testimony of the two witnesses, the trial court found that Ledges Partners had not "intended to defraud anyone" when it executed the Assignment, and that its intent in doing so "was to protect Ledges [Partners'] investors'

interests and ensure the viability of the [Option] in the wake of the recession." As long as this factual finding does not rest on any legal errors or infirmities, it is entitled to deference on appeal and will be reversed only if we determine it to be clearly erroneous. *See Eskelsen v. Theta Inv. Co.*, 2019 UT App 1, ¶ 18, 437 P.3d 1274.

¶27 Here, however, we discern several errors on the part of the trial court that led to this finding regarding intent. As we explain, most of these errors were legal in nature and were significant enough to have likely had an influence on the court's ultimate intent finding. We also identify one subsidiary factual finding that is clearly erroneous. Due to these errors, we vacate the court's ruling, and we remand this matter to the trial court for a reassessment, consistent with the principles discussed in this opinion, of Ledges Partners' intent in executing the Assignment.

¶28 The first group of errors we identify concerns the general parameters of the court's analysis of Ledges Partners' "actual intent." *See* Utah Code § 25-6-5(1)(a) (2016). Perhaps most significantly, the court omitted any discussion of whether Ledges Partners might have intended to "hinder or delay" its creditors. The governing statute offers three different ways in which a debtor's "actual intent" might be unlawful: if the debtor made the transfer to "hinder" a creditor; if the debtor made the transfer to "delay" a creditor; or if the debtor made the transfer to "defraud" a creditor. *See id.* In this case, the court made a finding that Ledges Partners did not intend to "defraud anyone" when it executed the Assignment. But the court did not engage in any analysis about whether Ledges Partners might have intended to "hinder" or "delay" its creditors when it executed the Assignment.

¶29 These three verbs do not have identical meaning. A debtor could conceivably intend to "hinder" a creditor without intending to "defraud" it. *Cf. Shapiro v. Wilgus*, 287 U.S. 348, 354 (1932) ("A conveyance is illegal if made with an intent to defraud the creditors of the grantor, but equally it is illegal if made with an intent to hinder and delay them."). At some level, we understand the trial court's apparent assumption

that "fraud" was a necessary condition to liability under a statute then titled as Utah's "*Fraudulent* Transfer Act." *See* Utah Code § 25-6-1 (2016) (emphasis added). But as the drafters of the uniform law pointed out in connection with their 2014 amendments, the law's title was at least somewhat "misleading" because fraud "has never been a necessary element of a claim under the Act." *See Uniform Voidable Transactions Act (2014 Amendments)*, Unif. L. Comm'n, https://www.uniformlaws.org/viewdocumen t/enactment-kit-89?CommunityKey=64ee1ccc-a3ae-4a5e-a18f-a5ba8206bf49&tab=librarydocuments [https://perma.cc/B63M-EYDL]. The trial court's finding that Ledges Partners did not intend to "defraud anyone" is therefore only part of the required analysis under section 25-6-5(1)(a) of the UFTA and, absent a determination about whether Ledges Partners intended to "hinder" or "delay" creditors, the court's analysis is incomplete.

¶30     And this lacuna in the court's analysis is made even more stark by the court's own observation that Ledges Partners' actual intent was to "protect [its] investors' interests." This locution begs the question: protect the investors' interests *from what*? The court gave no answer to this question specific to Ledges Partners, but it did offer a general observation that, in the wake of the 2007–2008 recession, "[s]mart developers and property owners took measures to survive and protect themselves *from the negative effects of the recession*." (Emphasis added.) The court offered no additional specifics about what these "negative effects" were. But it doesn't take much of a logical leap to infer that the negative effects of a recession include creditors seeking to collect on unpaid debts. Indeed, JENCO suggests that no logical leap is required; in its view, the court's finding that Ledges Partners' intent was to "protect [its] investors' interests" "compels the conclusion that the [A]ssignment was motivated, at least partially, to hinder and delay a creditor," because "the only way" for Ledges Partners to protect its investors' interests in the Option was to place it "beyond the reach of creditors such as JENCO." We recognize the inherent logic in JENCO's argument, and agree that, in this situation, the court's analysis was incomplete without identifying

the thing from which Ledges Partners was attempting to protect its investors' interests.

¶31    In this vein, JENCO correctly asserts that a fraudulent transfer can occur even where the debtor has a "mixed motive." *See Jones v. Mackey Price Thompson & Ostler*, 2020 UT 25, ¶¶ 44–45, 469 P.3d 879. Under the UFTA, "there is no requirement that the intent to hinder, delay, or defraud be the sole or even primary motive" of the debtor. *Id.* ¶ 44. To the contrary, "actual intent to hinder, delay, or defraud may be established on the ground that at least one of the defendant's motives was an impermissible one." *Id.* ¶ 45. A creditor "may carry [its] burden of showing that a defendant had actual intent to hinder, delay, or defraud without showing that it was the [debtor's] sole or primary motivation." *Id.* In its ruling, the trial court did not cite the *Jones* case or discuss the legal principle that mixed motive can be sufficient under the UFTA. And it was important that the court do so here, especially given its finding that Ledges Partners' intent was to "protect" its investors. It is certainly conceivable—perhaps even likely in a recession where debtors may have significant obligations to creditors—that a debtor who harbors an intent to protect its investors' interests will also have an accompanying motive to hinder or delay creditors. The court's failure to examine whether Ledges Partners had a mixed motive was erroneous.

¶32    The second group of errors we identify concerns the court's analysis of the "badges of fraud" listed in the statute. *See* Utah Code § 25-6-5(2) (2016). These statutorily listed indicators of fraud are a necessary part of the analysis of a fraudulent transfer claim because nefarious intent is rarely provable through direct evidence; courts therefore need to consider whether they can "infer fraudulent conduct from the circumstantial evidence and the surrounding circumstances of the transactions." *In re XYZ Options, Inc.*, 154 F.3d 1262, 1271 (11th Cir. 1998); *see also Max Sugarman Funeral Home, Inc. v. A.D.B. Invs.*, 926 F.2d 1248, 1254 (1st Cir. 1991) ("It is often impracticable, on direct evidence, to demonstrate an actual intent to hinder, delay or defraud creditors."); *In re Kaiser*, 722 F.2d 1574, 1582 (2d Cir. 1983)

("Fraudulent intent is rarely susceptible to direct proof. Therefore, courts have developed 'badges of fraud' to establish the requisite actual intent to defraud." (quotation simplified)).

¶33 Trial courts are certainly not required to analyze every single one of the statutorily listed badges in every case. *See* Utah Code § 25-6-5(2) (2016) (stating that "consideration *may* be given" to the listed factors (emphasis added)). But courts should, at a minimum, give consideration to those listed badges that the parties ask them to consider and that appear potentially relevant under the circumstances of the case. The analysis will typically require a court to review and assess several of the listed badges. *See Max Sugarman Funeral Home*, 926 F.2d at 1254–55 (stating that the "presence of a single badge of fraud may spur mere suspicion," but "the confluence of several can constitute conclusive evidence of an actual intent to defraud" (quotation simplified)); *United States v. Leggett*, 292 F.2d 423, 427 (6th Cir. 1961) (noting that even though the "badges of fraud are not conclusive and are more or less strong or weak according to their nature and the number occurring in the same case, a concurrence of several badges will always make out a strong case" (quotation simplified)); *Mane FL Corp. v. Beckman*, 355 So. 3d 418, 426 (Fla. Dist. Ct. App. 2023) ("Two or three badges of fraud can be enough to support a finding of actual intent to defraud."). After examining the relevant potential badges of fraud, the court should weigh them as appropriate, keeping in mind the ultimate question at hand: whether the debtor had actual intent to hinder, delay, or defraud creditors. *See In re Ritz*, 567 B.R. 715, 742 (Bankr. S.D. Tex. 2017) (stating that a court should "assign a particular weight to each badge of fraud as it sees fit" (quotation simplified)); *City Nat'l Bank, NA v. Breslin*, 175 F. Supp. 3d 1314, 1325–26 (D. Utah 2016) (stating that, although "all badges of fraud need not be present to support an inference of actual fraudulent intent, those that are present must support an inference of actual fraud"); *see also* Uniform Fraudulent Transfer Act § 4 cmt. 6 (Unif. L. Comm'n 1984) (stating that, in considering the badges of fraud, courts should "evaluate all the relevant circumstances" and weigh the factors "negativing as well as those suggesting fraud"). No one

factor is necessarily more important than others, but some courts and commentators have concluded that, in certain situations, the existence of one or two particular badges can be significant. *See In re Ritz*, 567 B.R. at 743 (stating that an insolvent debtor's transfer to an insider is "so significant" that it has convinced courts "to make a finding of actual fraud in the absence of any other badges of fraud" (quotation simplified)); Douglas G. Baird, *One-and-a-Half Badges of Fraud*, 60 Prac. L. 41, 43 (2014) ("As fraudulent conveyance law evolved, two badges of fraud gained particular prominence: transfers made while insolvent and transfers for less than reasonably equivalent value.").

¶34 In the "badges of fraud" part of its analysis, the court discussed only two of the statutorily listed factors—concealment and consideration—and determined that "JENCO has not proven that any badge of fraud existed here." The court's analysis was infirm, first, because that determination is clearly erroneous: it was and is undisputed that at least some of the badges of fraud are present here. In addition, the court's analysis was incomplete because it discussed only two of the listed badges, and because it failed to address JENCO's arguments that certain other badges were present. And finally, its analysis of the badges it did consider contained certain legal errors.

¶35 The second statutorily listed badge of fraud is that "the debtor retained possession or control of the property transferred after the transfer." *See* Utah Code § 25-6-5(2)(b) (2016). The court did not discuss this particular badge of fraud in its ruling, but this badge is unquestionably present here. In 2016, Manager explained to Ledges Partners' investors that Ledges Partners, through "[a]n affiliate," still retained "the rights" to the property subject to the Option Agreement and that the Option was Ledges Partners' "only remaining asset." And in 2017, Manager explained to JENCO—in a letter written on Ledges Partners' letterhead—that the Option, which was nominally assigned to SJI, was "the only remaining asset Ledges [Partners] has." Indeed, based on this evidence, SJI acknowledged, at oral argument before this court, that this badge of fraud is present. On this basis alone, we

conclude that the court's determination that no badges of fraud "existed here" is clearly erroneous.

¶36    The first statutorily listed badge of fraud is that the transfer was made "to an insider." *See id.* § 25-6-5(2)(a). The court discussed this badge only in passing, along the way to its conclusion that the Assignment was contractually authorized under the Option Agreement, the terms of which allowed Ledges Partners to assign its rights to an "Affiliate" as contractually defined. The court determined that SJI was an "Affiliate" of Ledges Partners, as that term was defined in the Option Agreement, and that the Assignment was therefore contractually authorized; the significance of this determination is discussed more fully below. But the court did not analyze whether SJI was an "insider" as that term is defined in the UFTA, *see id.* § 25-6-2(7), and therefore did not make any determination as to whether the first statutorily listed badge of fraud is present here.

¶37    The third listed badge is whether the transfer was "concealed" by the debtor. *See id.* § 25-6-5(2)(c). This badge is also unquestionably present: Ledges Partners did not tell JENCO about the Assignment for nearly seven years. The significance of this badge is, however, quite uncertain, given that JENCO agreed, as a matter of contract, that Ledges Partners did not need to notify it of any assignment to an "Affiliate." The court's analysis with regard to this badge began and ended with the conclusion that concealment was contractually authorized.

¶38    But transfers are not insulated from UFTA liability simply because they are contractually authorized. A contractual analysis is not the same as the statutory analysis required by the UFTA, and the court erred by conflating the two analyses in this case. *See In re EBC I, Inc.*, 356 B.R. 631, 640 (Bankr. D. Del. 2006) ("A transfer may be fraudulent even if it is made in accordance with the terms of a contract between the parties."). Indeed, courts applying the fraudulent transfer provisions of the federal bankruptcy code have found that an "otherwise legal transfer" may still be avoided if the requirements under the relevant statute are "otherwise

met." *In re Pinto*, 89 B.R. 486, 497–98 (Bankr. E.D. Pa. 1988) (quotation simplified); *see also In re Grandparents.com, Inc.*, 614 B.R. 625, 631 (Bankr. S.D. Fla. 2020) ("The existence of a binding contract does not foreclose a fraudulent conveyance claim if the elements of the cause of action for constructive fraud are met."); *In re Calais Reg'l Hosp.*, 616 B.R. 449, 456 (Bankr. D. Me. 2020) (stating that "a transfer made pursuant to a contract can be avoided as a fraudulent transfer").[5]

¶39    JENCO certainly agreed that Ledges Partners could, consistent with the terms of the Option Agreement, assign its rights thereunder to an "Affiliate" and could do so without notice; indeed, JENCO has not brought any claim asserting that Ledges Partners, by making the Assignment, breached the terms of the Option Agreement. But the legality of a transaction under contract law is not always equivalent to the legality of a transaction under statutes governing fraudulent conveyances; the same transaction can conceivably be in keeping with the terms of a contract yet violative of the elements of the UFTA.

¶40    SJI asserts that, if UFTA liability can lie for transactions authorized by the Option Agreement, then the courts would be "erroneously rewrit[ing] the Option Agreement" for JENCO's

---

5. In support of the contrary position, SJI relies on two cases: *Kamlapat v. Purvis-Wade Carpet Mills*, 146 S.E.2d 138 (Ga. Ct. App. 1965), and *Stewart v. Edgecomb*, 6 N.Y.S.2d 563 (N.Y. Sup. Ct. 1938). We find these cases unpersuasive. Not only were they decided before the Uniform Fraudulent Transfer Act was promulgated, *see supra* note 4, but they are factually distinguishable. In *Kamlapat*, the case was not decided on the terms of a contract but rather on the fact that the asset was transferred to a party that was not an insider and the debtor "obtain[ed] fair value for the goods." 146 S.E.2d at 144. And in *Stewart*, the court relied on estoppel principles and found that the creditor could not avoid a transaction where he had "full knowledge" of the relevant facts and had "suggested, advised and consummated" the transfer. 6 N.Y.S.2d at 564–65.

benefit and thereby "deny[ing] Ledges Partners the benefit of its bargain." But this argument conflates contract law with statutory law. Ledges Partners got the benefit of its bargain; it is not liable in contract to JENCO, and not even JENCO asserts otherwise. But Ledges Partners did not negotiate for a waiver, on JENCO's part, of its right to sue for breach of the UFTA; certainly, no express waiver of any such claim appears on the face of the Option Agreement or anywhere else in the record. And no such waiver can be implied on the facts of this case. *See Pioneer Builders Co. of Nevada v. K D A Corp.*, 2018 UT App 206, ¶ 12, 437 P.3d 539 ("A waiver of any statutorily guaranteed right must be explicitly stated, so that the parties' intent is clear and unmistakable." (quotation simplified)). Indeed, courts "will not infer from a general contractual provision that the parties intended to waive a statutorily protected right." *Id.* ¶ 15 (quotation simplified); *see also Soter's, Inc. v. Deseret Fed. Sav. & Loan Ass'n*, 857 P.2d 935, 942 (Utah 1993) (stating that waiver is "the intentional relinquishment of a known right" and that in order for waiver to occur, "there must be an existing right . . . , a knowledge of its existence, and an intention to relinquish it" (quotation simplified)).[6]

¶41    We do not mean to suggest that the existence of contractual authorization is completely irrelevant to consideration of whether a debtor had actual intent to hinder, delay, or defraud creditors. In some circumstances, the fact that a debtor's actions are contractually authorized might weigh in favor—perhaps even significantly so—of a conclusion that the debtor's intentions were not nefarious. Relatedly, it might also serve to negate the adverse

---

6. For similar reasons, SJI's claim that JENCO is equitably estopped from raising a claim under the UFTA is also infirm. An equitable estoppel claim requires, among other things, that there "be a statement, admission, act, or failure to act by one party inconsistent with a claim later asserted." *See Hall v. Peterson*, 2017 UT App 226, ¶ 29, 409 P.3d 133 (quotation simplified). We are unaware of any statement or conduct by JENCO, at any point, that would have led Ledges Partners to believe that JENCO was waiving any future claims it may have had under the UFTA.

effects of—or cause a court to weigh less negatively—one or more established badges of fraud. And it might matter, for purposes of weighing the significance of contractual authorization, whether the authorization was given by the plaintiff directly rather than by some other third party. The trial court's error here was not that it took JENCO's contractual authorization into account; rather, it was that the court stopped its analysis as soon as it concluded that the actions were contractually authorized, and it did not go on to consider the extent to which nefarious intent might be present notwithstanding contractual authorization.

¶42    Finally, we perceive error in the trial court's discussion of whether Ledges Partners received adequate consideration from SJI for the Assignment. In that regard, the court concluded that the Assignment was "supported by adequate consideration" because SJI agreed to assume Ledges Partners' responsibilities under the Option Agreement. For purposes of this discussion, we accept the court's conclusion that sufficient consideration was given to make the transaction valid under principles of contract law. But here again, the court was conflating principles of contract law with principles of statutory fraudulent conveyance law.

¶43    In the statutory list of potentially applicable badges of fraud, courts may consider whether "the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred." *See* Utah Code § 25-6-5(2)(h) (2016). As is implied from the phrasing of the statute, "consideration" is not necessarily the same thing as "reasonably equivalent value." Under contract law, courts will not ordinarily "inquire into the adequacy of consideration unless it is so insufficient or illusory as to render enforcement of the contract unconscionable." *See Reese v. Reese*, 1999 UT 75, ¶ 27, 984 P.2d 987; *see also* Howard O. Hunter, *Modern Law of Contracts* § 5:7 (2023) (noting that many courts apply the "peppercorn theory," under which "the value of consideration is irrelevant" because valid consideration "may be worth as little as a peppercorn as long as it is legally sufficient and is itself the thing bargained for"). But it should go without saying

that a "peppercorn," although it might constitute legally sufficient consideration under contract law, is not always reasonably equivalent to the value of the asset for which it is being exchanged. In light of this reality, the UFTA invites courts to consider whether the consideration given—even if legally adequate—"was reasonably equivalent to the value of the asset transferred." *See* Utah Code § 25-6-5(2)(h) (2016).

¶44    In undertaking this analysis, it is not sufficient to simply conclude—as the trial court here did—that the consideration offered was legally adequate under contract law. The next step—evaluating whether the consideration given was reasonably equivalent to the value of the asset transferred—is the much more important part of the process in terms of evaluating a debtor's intent and whether a creditor was harmed by a transfer. *See Rupp v. Moffo*, 2015 UT 71, ¶ 17, 358 P.3d 1060 (noting that, where a "transfer puts one asset beyond the reach of the creditors, but replaces the asset with one of equivalent value," all harm to creditors is avoided); *see also Klein v. Cornelius*, 786 F.3d 1310, 1321 (10th Cir. 2015) ("The primary consideration in analyzing the exchange of value for any transfer is the degree to which the transferor's net worth is preserved." (quotation simplified)). When assessing whether reasonably equivalent value was given, a court's analysis should go beyond mere contractual consideration, and should include an examination of "the totality of the circumstances," including "the fair market value of the benefit received as a result of the transfer." *In re PA Co-Man, Inc.*, 644 B.R. 553, 613 (Bankr. W.D. Pa. 2022) (quotation simplified). While there is no precise formula for how to determine whether a debtor received reasonably equivalent value, a "helpful starting point" is "the price which the [transferred] property would actually bring if presently offered for sale by the owner, with a reasonable time for negotiation." *In re Richardson*, 23 B.R. 434, 442 n.12 (Bankr. D. Utah 1982).

¶45    In this instance, the trial court made no effort to place a value on either (a) the consideration SJI gave for the Assignment or (b) the Option itself. The only consideration given was SJI's

promise to assume all of Ledges Partners' obligations under the Option Agreement; SJI provided no money in the exchange. While this promise was likely not valueless, we think JENCO raises valid questions regarding whether that promise constituted reasonably equivalent value, especially considering the evidence that, at one point, Manager valued the Option at $29.7 million. The court's failure to properly engage with this question was erroneous.

CONCLUSION

¶46     We have identified several legal errors, and one clearly erroneous subsidiary factual finding, in the trial court's analysis regarding whether Ledges Partners, in effectuating the Assignment, had the actual intent to hinder, delay, or defraud its creditors, including JENCO. We therefore vacate the trial court's ruling and remand the matter for reassessment of Ledges Partners' intent, and for further proceedings consistent with this opinion. We offer no opinion on whether the court can conduct its reassessment on the existing record or whether additional proceedings, evidentiary or otherwise, will be necessary.

———————