**2024 UT App 41**

# THE UTAH COURT OF APPEALS

CANDICE CROSSLAND SORENSEN,
Appellant,
*v.*
STEVEN G. CROSSLAND AND LORI A. MAY,
Appellees.

Opinion
No. 20220756-CA
Filed March 28, 2024

Third District Court, Salt Lake Department
The Honorable Mark S. Kouris
No. 180902903

Ralph C. Petty, Attorney for Appellant

Matthew N. Olsen and M. Tyler Olsen,
Attorneys for Appellees

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES GREGORY K. ORME and MICHELE M. CHRISTIANSEN
FORSTER concurred.

MORTENSEN, Judge:

¶1 A father and mother stole from their daughter by taking settlement funds of $133,000 awarded to her and buying themselves a house. Fifteen years later, the daughter discovered the theft and sued, obtaining a judgment of nearly $279,000. In the meantime, the parents divorced and the father remarried. The daughter then filed the present action, maintaining that her father fraudulently transferred funds to his new wife for less than equivalent value, all while paying nothing on the judgment and being insolvent. The matter came before the district court for trial. Midway through the examination of the daughter's first witness, the district court raised a legal issue, suspended the presentation

of witnesses and evidence, and ordered supplemental briefing. The district court indicated that a future hearing would be held. But no such hearing occurred, and instead the district court entered a ruling—the effect of which was the dismissal of the daughter's case. The daughter appeals, claiming legal error and a deprivation of due process. We agree and reverse.

BACKGROUND

¶2    Candice Crossland Sorensen, who was born in 1989, received about $133,000 in a medical malpractice settlement when she was a minor. The funds were placed into accounts managed by her parents, Steven G. Crossland and Cindi R. Crossland. In 1999, Steven and Cindi used these funds to purchase a house.[1] The property was titled in the parents' names only, and Candice moved into the house with her parents.

¶3    In 2014, when Candice learned of the use of her settlement money, she sued Steven and Cindi. This suit was not resolved until March 2018, at which point a judgment was entered against Steven and Cindi, jointly and severally, in the amount of nearly $279,000, with a judgment interest rate of 3.76%. No payments were ever made to Candice, and Candice did not attempt to collect the judgment.

¶4    Steven and Cindi divorced in January 2015, prior to the entry of the judgment, and in September 2015, Steven met and began living with Lori A. May. Steven moved into a property Lori was renting, and he paid Lori $700 monthly toward rent. Lori and Steven split the remaining expenses for utilities, car payments, and groceries. In July 2016, Steven and Lori ceased renting and

---

1. Because some of the parties share the same surname, we employ given names for all parties.

purchased a house, for which Steven made the mortgage payment while Lori shouldered other living expenses.[2]

¶5      In May 2018, Candice initiated this action against Steven and Lori for fraudulent transfer,[3] arguing that Steven gave money to Lori (1) without receiving anything of value in exchange, (2) "with the intent to hinder, delay, and defraud" Candice, and (3) while he was insolvent or about to become insolvent shortly after the transfer.

¶6      Extensive discovery was conducted, including the taking of depositions from Candice, Steven, and Lori. Candice also subpoenaed copies of Steven's and Lori's bank statements.

¶7      The action was set for a two-day bench trial, but the proceeding lasted only a half day. It began with the testimony of Steven, which was interrupted by the lunch break. Once back in session, the court ordered the parties to prepare briefs addressing the law on fraudulent transfer. Specifically, the court seemed to be concerned that Candice had not made any previous effort to collect the debt, which—in the court's view—removed her claim from the realm of fraudulent transfer. In reference to the money Steven owed Candice, the court stated,

> I don't believe that there is a legal obligation to pay the debt [from the judgment]. I think there's

---

2. The record is unclear as to what happened to the equity in the home purchased by Steven and Cindi.

3. The Fraudulent Transfer Act as been renamed to the Voidable Transactions Act. *See JENCO LC v. SJI LLC,* 2023 UT App 151, ¶ 20 n.4, 541 P.3d 321. However, we will use the nomenclature employed by the district court.

> probably a moral obligation, but I don't think there's a legal obligation.
>
> And the reason I think that is because once the debt is there, the law gives the creditor a number of tools by which to go get that debt. I mean, the creditor literally could seize personal assets and sell them, they could foreclose on homes, they could attach bank accounts, they could garnish wages. Those are all the tools that debt collectors have to go out and get this debt.
>
> Fraudulent transfer is, I think, a whole different chapter in . . . that we've got a collector trying to [collect on the debt], but the debtor is playing games with hiding the money or moving the title somewhere else, or doing whatever he can to avoid those methods. But I think the process starts with [debt collection] methods . . . .
>
> I don't think . . . there have been collection efforts in this case . . . . I don't know what has brought us to here. But I do believe, I know that the monthly rental payments and so forth that [Steven] is paying [Lori] to live in the house and so forth, I don't believe those are unlawful transfers.

Given this concern, the court instructed the parties to prepare supplemental briefing on whether Steven "paying half his rent by paying" Lori was "somehow a fraudulent transfer." The court indicated that once the supplemental briefing was completed, Candice was to file a request to submit and the court would "then go and schedule a hearing."

¶8 As it turns out, no request to submit was filed, but the court nevertheless issued a ruling—without the benefit of another hearing. Candice never had the opportunity to complete her

examination of Steven, call Lori as a witness (as she had indicated she would do in her disclosures), and rest her case.

¶9     The court's ruling was premised on this point:

> There was no evidence that [Candice] had initiated the traditional methods to satisfy [the] judgment. Nor that [Candice] provided evidence of even sending personal demand letters or placing similar phone calls. Instead, [Candice's] argument is that [Steven and Lori] did not pay the outstanding judgments, but instead continued to live their lives and satisfy their routine expenses.

From the lack of effort to collect the judgment, the court concluded that Candice had proved "no instance" that "any of [Steven and Lori's] use of money was [done] with 'actual intent to hinder, delay, or defraud' [Candice's] collection efforts" under the Uniform Voidable Transactions Act. *See* Utah Code § 25-6-202(1)(a) ("A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . with actual intent to hinder, delay, or defraud any creditor of the debtor . . . ."). In other words, because Candice had not shown that any "pending collection effort was thwarted" by Steven and Lori's expenditures, her claim of fraudulent transfer necessarily failed. Another current of the court's reasoning was that Candice had not shown that any of Steven and Lori's purchases were "unreasonable," implying that such a showing was necessary to establish an intent to defraud.

¶10    Candice subsequently filed a motion to amend the findings and a motion for a new trial. Candice's motions were based on the assertions that (1) Steven's examination was interrupted by the lunch break and never completed, (2) Lori was never "examined

and no evidence was entered in relation to her testimony" even though Candice had intended to call her, and (3) Candice did not "rest [her] case or indicate that [she] had completed [her] presentation of evidence to the court." Given the "state of the proceeding when the trial was recessed," Candice argued that many of the court's factual findings and conclusions of law were "unjustified." She asserted that "[w]ithout the opportunity to present the remainder of her evidence, the Court [could not] make accurate and comprehensive findings and conclusions" and that she would, accordingly, suffer "the denial of her due process rights." The court denied both motions. Candice appeals.

## ISSUE AND STANDARD OF REVIEW

¶11 Candice argues that the district court violated her right to a fair and meaningful trial under the due process clause of the Utah Constitution. *See* Utah Const. art. I, § 7. "Constitutional issues, including questions regarding due process, are questions of law that we review for correctness." *Salt Lake City Corp. v. Jordan River Restoration Network*, 2012 UT 84, ¶ 47, 299 P.3d 990 (cleaned up).[4]

## ANALYSIS

¶12 Truth be told, we are not sure what happened here. But we are sure that something seriously amiss occurred when Candice was not provided with the opportunity to fully present her case.

---

4. Candice also asserts that the district court erred in denying her motions to amend the findings and for a new trial. Because we resolve this appeal on the first issue, we have no need to address these other claims of error.

¶13 We agree with Candice that her due process rights to a fair and meaningful trial were denied. There is no question that Candice never completed her presentation of evidence through the examination of Steven and Lori. Indeed, in its order denying Candice's two post-trial motions, the district court stated that "[a]fter reviewing the audio recording" of the trial, it found that Candice's claim that she "presented only a portion of the examination" of Steven "to be true, albeit out of context." "To provide context," the court stated that Candice's examination of Steven consisted entirely of "having [Steven] go line-by-line through his check register and explain each transaction" and that "the balance of this testimony would be to continue the trip through [Steven's] check register." It appears that the court concluded that such evidence would not be helpful, and it was at this point that the court instructed the parties to prepare supplemental briefing because the court could "[n]ot understand[]" how these transactions could be the "basis for the fraudulent conveyance claims." The district court's explanation fails, however, to address why, despite the court not understanding how the transactions would support Candice's claims, it did not allow the witness to complete his testimony; nor did the district court explain why no other witnesses or evidence would be allowed.[5] Candice also never rested her case in this trial

---

5. That is not to say that a district court could never curtail the presentation of evidence that the court found unhelpful. *See* Utah R. Evid. 611(a) ("The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment."). For example, the district court could have solicited a proffer of the remainder of Candice's case in chief. *See State v. Boyd*, 2001 UT 30, ¶ 36, 25 P.3d 985 ("A proffer is a mechanism by which a party may

(continued…)

precipitously terminated by the court. The proceeding was simply suspended, as far as we can tell, but never reconvened.

¶14    "No principle is more fundamental to the integrity of a society that claims allegiance to the rule of law than the principle that a person may not be deprived of his property without first being afforded due process of law." *Brigham Young Univ. v. Tremco Consultants, Inc.*, 2007 UT 17, ¶ 28, 156 P.3d 782. "Due process of law requires" that a court "hears before it condemns, proceeds upon inquiry, and renders judgment only after trial." *Riggins v. District Court*, 51 P.2d 645, 660 (Utah 1935) (cleaned up).

¶15    This principle is repeatedly embodied in the Utah Rules of Civil Procedure. "In all actions tried upon the facts without a jury . . . the court must find the facts specially and state separately its conclusions of law. The findings and conclusions must be made part of the record and may be stated in writing or orally following the *close of the evidence*." Utah R. Civ. P. 52(a)(1) (emphasis added). And a court is allowed to make a judgment on partial findings only if "a party has been *fully heard* on an issue during a nonjury trial." *Id.* R. 52(e) (emphasis added).

¶16    That did not happen here. Candice was never "fully heard" on her fraudulent transfer claim. Not only was she unable to complete her examination of Steven, but she was never afforded the opportunity even to begin her examination of Lori, who was disclosed as a witness. We are hard pressed to see how Candice was heard in a way that would satisfy her due process rights. Additionally, we note that the district court, shortly after it instructed the parties to submit supplemental briefing, expressly stated that it would "schedule a hearing" upon receiving Candice's notice to submit. But Candice filed no such request, and

_____

create an appellate record of what the evidence would have shown."). With that record, we might have been able to determine whether Candice's claims could have entitled her to a judgment.

the court did not schedule such a hearing. Given the procedural posture of the case, Candice had every reason to believe that she would be afforded the opportunity to complete her presentation of evidence and then rest her case, and it must have come as a surprise to her that the court issued its ruling prematurely.

¶17 Accordingly, we reverse the court's ruling and remand this matter for further proceedings to allow Candice the opportunity to complete her presentation of evidence.

¶18 Because this matter is being remanded, and where the district court will likely face the same question about the applicability of Utah's fraudulent transfer law, we provide the following guidance. *See In re A. Dean Harding Marital & Family Trust*, 2023 UT App 81, ¶ 149, 536 P.3d 38 (offering guidance regarding an issue ancillary to the reason for remand). The court repeatedly mentioned that Candice never made any efforts to collect on the judgment, the implication being that she could not show an intent to defraud, hinder, or delay without having first made such an effort. But we point out that there is no requirement that a person attempt any collection efforts prior to filing a fraudulent transfer action. *See* Utah Code § 25-6-202(1). The Uniform Voidable Transactions Act *expressly* states that a creditor can pull back transfers "whether the creditor's claim arose before or after the transfer was made or the obligation was incurred." *Id.* In other words, the debt does not necessarily have to be liquidated to support a fraudulent transfer claim. The only requirement is that the debt exist, even if it's on an unliquidated or a contingent basis. Here, there is no question that Steven's debt to Candice existed before the alleged fraudulent transfers were made. The debt arose the moment that Candice was entitled to the medical malpractice settlement money. Indeed, Steven admitted in his deposition that he knew Candice was entitled to the money but due to his and Cindi's actions, the money was not available:

*Counsel*: [A]s part of [Candice's medical malpractice] settlement, there was a sum of approximately $133,000 that went into a trust account that was controlled by her parents, you and Cindi, that was paid for by the doctors; correct?

*Steven*: Yes.

*Counsel*: Now, the understanding was, I guess, that when Candice reached the age of 18 years old, that that money would become hers; is that correct?

*Steven*: Correct.

. . . .

*Counsel*: Now, at the time Candice turned 18 or thereafter, those funds . . . that you and Cindi controlled . . . were not made available to her, were they?

*Steven*: No . . . .

*Counsel*: And the reason was because they had been utilized for the purchase of the [first house]; is that correct?

*Steven*: Correct.

And it was well after Steven was aware of his indebtedness to Candice (she turned eighteen in 2007) that he made the alleged fraudulent transactions associated with the purchase of the second house with Lori in 2016. To put it plainly, Candice was under no obligation to engage in collection efforts when, as here, the debtor was well aware of his obligation. Indeed, it seems to us that any expenditures Steven made after Candice was entitled to medical malpractice settlement money could potentially—if

supported by evidence that they were made with an intent to hinder, delay, or defraud—be the basis for a fraudulent transfer claim.

## CONCLUSION

¶19    We conclude that Candice's due process rights were abridged when the district court issued a ruling in the context of a trial without affording Candice the opportunity to complete her presentation of evidence. We reverse the district court's order dismissing her case and remand this matter for proceedings consistent with this opinion.

———————